These appeals and cross-appeal involve the question of the constitutionality of an act of the legislature which authorizes horse racing in the City of Birmingham.
The trial court, after reviewing the law, the briefs, and joint exhibits, and without taking any testimony, entered the following decree:
 FINAL JUDGMENT
"This proceeding in Quo Warranto seeks to prevent the exercise of corporate powers by The Birmingham Racing Commission (the `Commission') and also seeks a declaratory judgment that Act No. 84-131 of the 1984 Regular Session of the Legislature of Alabama (the `Act') is unconstitutional. In challenging the constitutionality of the Act the Plaintiffs have raised various issues concerning: the constitutionality and effect of Section 11-40-12, Code of Alabama (1975); the applicability of Article IV Sections 94, 104 and 105 of the Constitution of Alabama of 1901 ('Alabama Constitution') to the Act; the variances between the notice of the Act which was published and the Act as passed; and the applicability of the equal protection clause of the United States Constitution.
"The issues were submitted to the Court on briefs and joint exhibits. No oral testimony was taken.
"Several of the issues turn on whether the Act is a local law or a general law. Before the ruling in Peddycoart v. City ofBirmingham, 354 So.2d 808 (Ala. 1978) Article IV, Section 110 of the Alabama Constitution defined a local law as `a law which *Page 1110 
applies to any political subdivision or subdivisions of the state less than the whole.' The Peddycoart decision stated `Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it.' Amendment No. 375 to the Alabama Constitution was passed which amended Article IV, Section 110 and which granted the legislature the authority to enact a schedule of not more than eight classes of municipalities based on population. Amendment 375 provided that a law that applied to a whole class of municipalities was a general law. The legislature then passed an act which became Section 11-40-12 of the Code and which established the eight classes of municipalities authorized by Amendment 375. Finally, Amendment 397 to the Alabama Constitution was passed which incorporated the definition of a general law contained in Amendment 375 and which specifically `ratified, approved, validated and confirmed' the classes of municipalities established by the act which became Section 11-40-12. Therefore, Article IV, Section 110, as amended, now defines a general law as `a law which in its terms and effect applies either to the whole state, or to one or more municipalities of the state less than the whole in a class.' Section 110 goes on to state that general laws for any purpose may be enacted for any class. When a general law applies to only one municipality, notice of such law must be given as required in Section 106 of the Alabama Constitution for special, private or local laws. This notice requirement does not, however, make the general law a local law. Local laws are now defined as `a law which is not a general law or a special or private law.'
"Among other things, the Act provides for horse racing and pari-mutuel wagering in Class 1 municipalities and for the establishment of a racing commission to regulate those activities. A Class 1 municipality is defined in Section11-40-12 as `all cities with a population of 300,000 inhabitants or more' and the population requirement was based on the 1970 federal decennial census. Birmingham was the only city to fall into Class 1 and will remain as the only Class 1 municipality unless future legislation changes the situation. Thus, while the Act applies to all Class 1 municipalities, it only applies to Birmingham.
"Based on the above, it is the opinion of the Court that Section 11-40-12 is constitutional having been passed pursuant to one constitutional amendment and ratified, approved, validated and confirmed by another. It is further the opinion of the Court that Article IV, Section 110 of the Alabama Constitution now specifically permits general laws to be passed with [sic] apply only to one class of municipalities even when that class is made up of only one municipality. Section 110 does, however, still provide for local laws when a law does not apply to the entire state and does not apply to one class as established in Section 11-40-12. [Opinion of the Justices No.268, 381 So.2d 632 (Ala. 1980)]. If the Act is a local law, it violates several provisions of Article IV, Section 104 and Article IV, Section 105 of the Alabama Constitution. It appears to the Court that if the Act applies to all of Jefferson County, Alabama, it is a local law. However, Section 47 of the Act provides that the provisions of the Act are severable. The Court finds that it is the express intention of the Act to apply to Class 1 municipalities and, as such, to be a general law under the provisions of Section 11-40-12 and Article IV, Section 110, as amended. The Court further finds that it can sever those provisions which relate to Jefferson County as a whole and thereby construe the Act as a general law. Upon review of the Act the Court finds that the only provision which needs to be severed is that part of Section 46 that pertains to a county-wide referendum. In addition to the general severability clause of Section 47, Section 46 contains a specific severability clause which allows for the severance of the provision pertaining to the county-wide referendum.
"Article IV, Section 94, as amended by Amendment No. 112, of the Alabama Constitution provides that the legislature may not authorize a city to lend its credit, or to *Page 1111 
grant public money to any individual, association or corporation. This section has been held to apply only to private corporations, [Opinion of the Justices No. 147,263 Ala. 174, 81 So.2d 699 (1955)]. The Commission is a public corporation and thus, as to loans it may receive, it is not subject to the restrictions of Article IV, Section 94, as amended, which apply to private corporations. Furthermore, the Commission is not, itself, a political subdivision of the state so that the provisions of Article IV, Section 94, as amended, do not apply to the Commission's own transactions. [AlabamaHospital Association v. Dillard, 388 So.2d 903 (Ala. 1980);Knight v. West Alabama Environmental Imp. Auth., 287 Ala. 15,246 So.2d 903 (1971)].
"Article IV, Section 104 of the Alabama Constitution provides that the legislature shall not pass a special, private, or local law in any of the 31 subject areas set out therein. The section ends with a statement that the legislature shall pass general laws covering those subjects. Here, Article IV, Section 110 of the Alabama Constitution, as amended, creates a severe conflict with the general need to have uniform laws on some subjects throughout the entire state. By definition, Section 104 is not applicable to the Act because Section 104 applies to special, private and local laws and the Court finds the Act to be a general law under Section 110. However, many of the subjects which would formerly have come within Section 104 must still be considered under the equal protection clause of the United States Constitution. This is clearly shown by the decision in Peddycoart, supra, and in Crandall v. City ofBirmingham, 442 So.2d 77 (Ala. 1983). In considering the equal protection clause, it should be noted that, whereas Section 104 prevented the passage of any local legislation concerning certain subjects, equal protection considerations do allow for legislation which is applicable to specific geographical areas.[Salsburg v. State of Maryland, 346 U.S. 545, 74 S.Ct. 280,98 L.Ed. 281 (1954), Young v. State, 283 Ala. 676, 220 So.2d 843
(1969)]. Even so, the Court finds that some of the provisions of the Act do violate the equal protection provisions and are therefore invalid. Section 37 of the Act provides that the holding of a horse [race] without a license, and some forms of wagering, shall be a misdemeanor. Section 39 of the Act provides that certain tampering with horses shall be a felony. Section 40 of the Act provides that with the exception of television or radio coverage, the transmission of certain racing information within specified periods before and after the races shall be a felony. It is the opinion of the Court that felonies and misdemeanors must be applicable to the state as a whole, not just Class 1 municipalities and, therefore, Sections 37, 39, and 40 of the Act are invalid.
"Section 10 (9) of the Act provides that the Commission may adopt reasonable rules, regulations and conditions covering racing and pari-mutuel wagering. Such rules and regulations may include civil penalties for the violation thereof. Section 10 (10) gives the Commission the power to issue subpoenas to compel the attendance of witnesses and the production of documents. Section 21 of the Act allows the Commission to suspend or revoke a license or to fine the holder up to $5,000.00 and Section 26 provides for the suspension or revocation of a permit or for a fine of up to $1,000.00. It appears clear that the legislature may grant a public corporation the right to adopt and enforce rules and regulations. [Opinion of the Justices No. 147, supra]. The grant of the power to issue subpoenas is not as clear. The Court specifically asked counsel to address this issue in their briefs but they apparently were unable to find any authority on the subject. The agencies and associations listed by counsel to which the subpoena power has been granted are state agencies, not public corporations, and, thus, not conclusive of the issue. The Court's own research, including a general review of sources such as C.J.S. and Am.Jur., has been equally unproductive. Thus, since every presumption and intendment is in favor of the validity of the Act, the Court finds that Sections 10 (9), 10 (10), 21 and 26 of the Act are valid. *Page 1112 [Alabama State Federation of Labor v. McAdory, 246 Ala. 1,18 So.2d 810 (1944), cert. dismissed 325 U.S. 450, 65 S.Ct. 1384,89 L.Ed. 1725 (1945)].
"Article IV, Section 105 of the Alabama Constitution provides that no local laws shall be enacted in any case which is provided for by a general law. Since the Court has found that the Act may be construed as a general law, it is the opinion of the Court that the Act does not violate Article IV, Section 105.
"There are several differences between the text of the proposed act as published in the newspapers and the Act as finally passed. Some changes are permissible. [McGehee v. Stateex rel. Tate, 199 Ala. 187, 74 So. 374 (1916);Birmingham-Jefferson Civic Center Authority v. Hoadley,414 So.2d 895 (Ala. 1982)]. One change was the inclusion in the Act of the provision in Section 48 calling for a county-wide referendum whereas the published notice had provided for a referendum within the Class I municipality. The Court does find that this is a material variance, however, that provision may be severed from the Act and therefore the Act does not become invalid because of it. [In the referendum held June 12, 1984, the voters within the City of Birmingham and in Jefferson County as a whole voted in favor of the Act, thus, the severance of this provision does not change the outcome of the referendum]. Another change which might be material is the method of selection of one of the Commission members. The published notice provided that one member would be appointed by the mayor of the sponsoring municipality whereas Section 5 of the Act provides that such member shall be appointed by the Lieutenant Governor of the State. It is clear from the cases that the method of selection of persons serving on boards and commissions is a material part of the required notice.[Birmingham-Jefferson Civic Center Authority v. Hoadley,supra]. However, in the Opinion of the Justices No. 97,252 Ala. 361, 41 So.2d 266 (1949), the Supreme Court approved of a change in the method of selection of one member of a five member board and held that it was not such a material change as to violate the provisions of Article IV, Section 106 of the Alabama Constitution. In that opinion the Supreme Court held:
 "`We beg to advise that it is our opinion that an amendment striking from House Bill 333 the words "The Governor shall appoint a qualified resident of Colbert County to serve as Chairman and fifth member of the board . . ." [a]nd substituting in lieu thereof `Morris Greshal Hale is hereby designated and declared to be the fifth member and chairman of said Board of Revenue . . .," is not such material change in the provisions of the Act as would violate section 106 of the Constitution.' (41 So.2d at 267)
The Court, therefore, finds that the change in the method of appointment of one of the five members of the Commission is not such a material change as would cause the Act to be invalid. The Court has reviewed the other changes, between the published notice of the proposed Act and the Act as passed by the legislature, which have been noted by counsel and it does not find any of them to be so material as to cause the Act to be invalid.
"The Court has previously discussed what it found to be the most serious aspect of the Act in relation to the issue of the equal protection clause of the United States Constitution. Based upon the holdings in Salsburg v. State of Maryland, supra and Young v. State, supra, it is the opinion of the Court that when the Act grants certain rights, powers, or authority to Class 1 municipalities, it does not thereby, per se, violate the equal protection rights of persons living outside of the Class 1 municipality. It is further the opinion of the Court that, except for the provisions of Sections 27, 39, and 40 of the Act which create new felonies and misdemeanors, the provisions of the Act are not invalid under the equal protection clause of the United States Constitution.
"It is, therefore, ORDERED, ADJUDGED and DECREED by the Court as follows: *Page 1113 
"ONE: Section 11-40-12 Code of Alabama (1975) is a constitutionally valid section.
"TWO: That portion of Section 46 of Act No. 84-131 which provided for a countywide referendum is severed from the Act and after such severance the Act is a general law.
"THREE: Act No. 84-131 does not violate the provisions of Article IV, Section 94, as amended by Amendment No. 112, of the Constitution of Alabama of 1901.
"FOUR: Sections 37, 39, and 40 of Act No. 84-131 violate the equal protection provisions of the United States Constitution and are, therefore, invalid.
"FIVE: Sections 10 (9), 10 (10), 21 and 26 of Act No. 84-131 are valid delegations of authority by the state legislature.
"SIX: Act No. 84-131 does not violate the provisions of Article IV, Section 104 of the Alabama Constitution.
"SEVEN: Act No. 84-131 does not violate the provisions of Article IV, Section 105 of the Alabama Constitution.
"EIGHT: The amendment which required a county-wide referendum instead of a referendum within the Class 1 municipality was a material change between the notice which was published in the newspapers and Act No. 84-131 as finally passed. However, Section 46 of Act No. 84-131 which contains this amendment provided that it could be severed from the other provisions of the Act and the Court has severed it from the Act so that such material change does not cause the entire Act to be invalid.
"NINE: The change in the method of appointment of one member of The Birmingham Racing Commission is not such a material change as would cause Act No. 84-131 to be invalid.
"TEN: Except for Sections 37, 39 and 40 of Act No. 84-131, the provisions of the Act do not violate the equal protection provisions of the United States Constitution.
"ELEVEN: The relief requested by the Plaintiff in the proceeding in quo warranto is denied.
"TWELVE: Costs of this action are taxed to Plaintiff.
"DONE and ORDERED this 9th day of May, 1985.
 "/s/ Jack D. Carl Circuit Judge"
 I
As the trial court pointed out, the principal issue in this case is whether Act 84-131 is a general law and constitutional, or a local law and unconstitutional. Crosslin v. City of MuscleShoals, 436 So.2d 862, 863 (Ala. 1983), lists several well established principles of law relevant to this issue:
 "(1) It is the duty of courts to sustain the constitutionality of a legislative act unless it is clear beyond a reasonable doubt that it is in violation of the fundamental law. Brittain v. Weatherly, 281 Ala. 683, 385, 207 So.2d 667, 668, 669
(1968).
 "(2) A court is duty bound not to construe the act as a local one when it is so framed as to be reasonably susceptible of interpretation as a general law. State ex rel. Montgomery v. Merrill, 218 Ala. 149, 152-155, 117 So. 473, 476 (1928).
 "(3) A statute that has a `bona fide application to the entire state in some of its chief features' is a general law, though it does not apply in every detail throughout the entire state. State ex rel. Collman v. Pitts, 160 Ala. 133, 134, 49 So. 441, 442 (1909).
 "(4) Whether a statute is general and valid, or local and invalid, must be determined from the statute as a whole. The legislative mind is to be read from an act as a whole. Dillon v. Hamilton, 230 Ala. 310, 160 So. 708 (1935).
 "We remain cognizant of these principles on review of the issues presented."
 A The Constitutionality of Act No. 84-131 Under the 1901 Constitution of Alabama
Act No. 84-131, codified as Code 1975, §§ 11-65-1 through11-65-47, permits *Page 1114 
horse racing and pari-mutuel wagering thereon, subject to a public referendum, in Class I municipalities as defined in §11-40-12. Section 11-40-12 defines Class I municipalities as those having populations of 300,000 or more inhabitants, based on the population as certified by the 1970 federal decennialcensus. All parties in this case agree that, without further legislative action, Birmingham is the only Alabama city classified as a Class I municipality under this definition, and, thus, under the provisions of Act No. 84-131, is the only Alabama city allowed to authorize horse racing.
There is no doubt that prior to the ratification of Amendments 375 and 397 to Section 110 of the 1901 Constitution of Alabama, this legislation would be void as a local act. As originally enacted, Section 110 provided:
 "A general law within the meaning of this article is a law which applies to the whole state; a local law is a law which applies to any political subdivision or subdivisions of the state less than the whole; a special or private law within the meaning of this article is one which applies to an individual, association, or corporation."
The clear intent of Section 110 is to prevent local populations from resorting to the legislature to solve every local issue. Adams, Legislation by Census: The AlabamaExperience, 21 Ala.L.Rev. 401, 404 (1969). See, 2 OfficialProceedings of the Constitutional Convention of the State ofAlabama May 21st, 1901, to September 3rd, 1901, at 1778-1782 (1940). Thus, the constitution placed limitations on the power of the legislature to enact local laws. See, Article IV, §§ 104, 105, 106, 1901 Constitution of Alabama. Shortly after the adoption of the 1901 Constitution, however, this Court, by judicial interpretation, construed the language of Section 110 to permit legislation based on population distinctions. This legislation, by reason of these population classifications, became known as general bills with local application. As explained in Reynolds v. Collier, 204 Ala. 38, 39-40,85 So. 465, 476 (1920):
 "The effect of all of our decisions, in short, has been that where there is a substantial difference in population, and the classification is made in good faith, reasonably related to the purpose to be effected and to the difference in population which forms the basis thereof, and not merely arbitrary, it is a general law, although at the time it may be applicable to only one political subdivision of the state; but that if the classification bears no reasonable relation to the difference in population, upon which it rests, in view of the purpose to be effected by such legislation, and clearly shows it was merely fixed arbitrarily, guised as a general law, and, in fact, is a local law, it is then in plain violation of the Constitution and cannot be upheld."
This exception allowed many statutes to be upheld which by their terms applied not to the entire state, but to counties or municipalities which fell within specified population classifications. Justice Shores, in Belcher v. McKinney,333 So.2d 136, 140 (Ala. 1976), explained the rationale for allowing these acts to be classified as general, as follows:
 "Still, for the Act to be a `general' law it must have application to a shifting class. In other words, there must exist a possibility of application to other counties which may come within the classification fixed by the statute."[1]
The concept was that population classifications, when established in an act, were permitted if the possibility existed for other subdivisions to grow into the classification.
In Peddycoart v. City of Birmingham, 354 So.2d 808, 814
(1978), this Court reviewed the history of its decisions on the "general" versus "local" law dichotomy, and issued an opinion which, in effect, required the legislature, on pain of having its *Page 1115 
acts declared unconstitutional, to follow the literal language of Section 110:
 "Therefore we respectfully direct the legislature's attention to the fact that § 110 of the Alabama Constitution mandates the definition of a local law. It is one `which applies to any political subdivision or subdivisions of the state less than the whole; . . .' (emphasis added). Applies when? Obviously, when it becomes law! If, when it becomes law it applies only to a subdivision of the state, it is a local law. That is the clear meaning of the language employed by our constitutional framers. In the face of this plain language, to conclude that the application of a law to less than the entire state makes no difference when a futuristic population classification is employed is to engage in sophistic reasoning. . . . Henceforth when at its enactment legislation is local in its application it will be a local act and subject to all of the constitutional qualifications applicable to it."
Clearly, Peddycoart held that if, at the time of its enactment, an act applied to only one political subdivision, whether a county or a city, then it was a local act and subject to the restraints of the Alabama Constitution on local legislation.
The appellants in the Cope appeal contend that Peddycoart did not change the law regarding local and general acts that had previously existed. They argue that Peddycoart held that if, when enacted, a law does not have prospective application to more than one subdivision, it is local. They argue that if the classification established by the act is "open," it is general, and that because Birmingham is the only municipality in Alabama that can ever be a Class I municipality, they contend that the act is local.[2]
The legislature, almost immediately upon learning that it would be bound under Peddycoart to a literal interpretation of Section 110, proposed an amendment to Section 110, and this proposed amendment became Amendment 375 when it was ratified by the people. That amendment redefines local and general laws:
 "A general law is a law which in its terms and effect applies either to the whole state, or to one or more municipalities of the state less than the whole in a class. A general law applicable to such a class of municipalities shall define the class on the basis of criteria reasonably related to the purpose of the law, provided that the legislature may also enact and change from time to time a general schedule of not more than eight classes of municipalities based on population according to any designated federal decennial census, and general laws for any purpose may thereafter be enacted for any such class. Any law heretofore enacted which complies with the provisions of this section shall be considered a general law.
 "No general law which at the time of its enactment applies to only one municipality of the state shall be enacted, unless notice of the intention to apply therefor shall have been given and shown as provided in Section 106 of this Constitution for special, private or local laws; provided, that such notice shall not be deemed to constitute such law a local law.
 "A special or private law is one which applies to an individual, association or corporation. A local law is a law which is not a general law or a special or private law."
Thereafter, the legislature passed Act No. 79-263, codified as Code 1975, § 11-40-12, establishing eight classes of municipalities as authorized by Amendment 375. The classifications were based on the 1970 federal decennialcensus, which was then the most recent federal decennial census. Amendment 397 also addressed the problem *Page 1116 
of general laws with local application, and restated Amendment 375, but added:
 "Act No. 79-263 (House Bill No. 68) entitled `An Act to establish eight classes of municipalities, by population, based on the 1970 Federal decennial census, approved June 28, 1979, and each and every Act of the legislature thereafter enacted referred [sic] or relating to a class of municipalities as established in said Act No. 79-263 are hereby in all things ratified, approved, validated and confirmed as of the date of their enactment, any provision or provisions of the Constitution of Alabama, as amended, to the contrary notwithstanding."
The Cope appellants argue that these amendments did not change the rule in Peddycoart. We disagree. The express language of Amendment 397 authorizes general laws applicable to a class containing only one municipality; provided, of course, the bill is advertised pursuant to Article IV, Section 106, of the 1901 Alabama Constitution. Clearly, the amendment authorizes legislation not authorized under Section 110 as interpreted by Peddycoart. Moreover, Amendment 397 ratified any action of the legislature regarding the eight classes of municipalities established by Act No. 79-263. In effect, the amendment ratified all laws enacted pursuant to this Act as general acts, even though those laws may apply to only one municipality.
Each appellant argues that a construction of Amendment 397 that permits the passage of general laws applicable to a class containing a single municipality would somehow destroy all distinctions between local and general laws and would permit the wholesale circumvention of Sections 104, 105, and 110 of the Constitution of Alabama. We are of the opinion that this argument is not sound in two respects. First, Amendment 397 does not purport to, and does not, abolish all distinctions between general and local laws. The restrictions applicable to local laws remain vital with respect to laws applicable to the various counties, laws applicable to designated individual municipalities, and laws applicable to other types of geographic regions or political subdivisions less than the entire state. Thus, after the enactment of Amendment 397, the distinction between general and local laws remains vital despite the existence of constitutional provisions which permit the Legislature to enact general laws applicable to a class containing only one municipality.
Second, and more fundamentally, this argument is not sound, because it logically suggests that the legislature and the people of this state may amend the Constitution of Alabama only if the new provisions are consistent with every existing provision of the Constitution. This argument ignores the fact that Amendment 397 is part of the Constitution and that legislation passed in accordance with the terms of the amendment cannot be repugnant to that same Constitution. To adopt this argument would be to prohibit amendments.
The principle underlying Amendments 375 and 397 was twice proposed by the legislature and twice ratified by the people of this state and now is as much a part of our organic law as any other part of the Constitution. No decision of this Court, either before or after Peddycoart, has challenged the right of the legislature and the people of Alabama to amend the Constitution, even though such amendments may be inconsistent with previous provisions of the Constitution. The Act under review is a statute applicable only to Class I municipalities, and, as such, it is a general law of the state, because Amendment 397 to the Constitution specifically provides that such a statute is a general law. The act was advertised pursuant to Section 106, as required in Amendments 375 and 397 for laws applicable to only one municipality; therefore, the act is constitutional under the Alabama Constitution.
 B The Constitutionality of Act No. 84-131 Under the Federal Constitution
Appellant Phalen concedes that the act was passed in compliance with Amendment *Page 1117 
397, and that the amendment changed the definitions of local and general laws then extant, but argues that the Amendment itself allows arbitrary classification of municipalities by population, which the legislature did in §11-40-12, and that the amendment, and the act setting up classifications violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. Phalen contends:
 "No classification of persons which affords different treatment under the law to similarly situated persons can withstand equal protection scrutiny. The Peddycoart decision clearly stands for this very proposition. General laws apply to the whole state and treat all citizens equally. Local laws apply to a limited number of persons, and treat those persons differently. The purpose of local acts is to allow for the special needs of local areas. When properly utilized to deal with special needs of particular areas, local acts are quite proper. To allow for special legislation for a particular municipality or group of municipalities for no reason other than the legislature arbitrarily determines to provide this special treatment is not a proper use of local legislation. The legislature can only pass such laws where there is some rational nexus between the class being afforded the different treatment and the purpose of the law."
When there are no suspect classes or fundamental rights involved, this Court must uphold legislation if any rational basis exists for the population classification used. See, Tysonv. Johns-Manville Sales Corp., 399 So.2d 263, 271 (Ala. 1981);Muncaster v. Alabama State Ethics Commission, 372 So.2d 853
(Ala. 1979). We must determine if there is a rational basis for the population classifications ratified in Amendment 397 and set out in Code 1975, § 11-40-12. Clearly, under the United States Constitution, "territorial uniformity is not a constitutional prerequisite." McGowan v. State of Maryland,366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Thus, the legislature may pass laws which affect different areas in different ways, as long as some rational basis exists for the distinction. Obviously, the needs of a municipality will vary somewhat according to its population and the legislature may consider these needs in enacting legislation. See, Opinion ofthe Justices, No. 81, 249 Ala. 511, 31 So.2d 721 (1947).
Even though we find Amendment 397 constitutional, the equal protection guarantees of the federal constitution still require that we determine whether any rational basis exists for distinguishing Birmingham from the rest of the state for purposes of establishing a horse racing facility. We find that the legislature was authorized to conclude that such a basis does exist.
The legislature could have determined that a major horse racing facility, such as that contemplated for Birmingham, requires a substantial capital investment and the patronage of many people. The legislature could further find that the racing facility proposed for Birmingham, for instance, could be expected to cost a substantial amount of money and would require governmental bodies to finance access roads and make other improvements in the area of the horse racing facility at a substantial outlay.
Appellants further seek to establish the discriminatory effect of the act, by arguing that the population of Birmingham under the 1980 federal decennial census is no longer sufficient to classify Birmingham as a Class I municipality, but that under the 1980 census, Birmingham is a Class II municipality. They contend that any rational basis for distinguishing Birmingham from other Class II municipalities no longer exists. We need not decide when or under what circumstances, if ever, legislation might be unconstitutional in its application under the equal protection clause of the Fourteenth Amendment when the legislature does not use the most recent federal decennial census in adopting legislation as authorized by Amendments 375 and 397. We are satisfied no discrimination is present here, for the reasons we have already enunciated. The 1980 census lists *Page 1118 
the population of the Birmingham standard metropolitanstatistical area as being 847,487. In contrast, the city with the second largest metropolitan area population, Mobile, has a metropolitan population of only 443,536. Thus, while the population of the city of Birmingham may not vary substantially from the population of Mobile or Montgomery, which are the two other Class II municipalities in Alabama under the 1980 census, the area surrounding Birmingham is the most densely populated area in the state.
"[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the government decision maker."Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464,101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981). Under a different factual setting, a person might be able to show an unconstitutional discrimination, but these appellants have not done so here.
 II
Appellants also contend that voters in Birmingham and Jefferson County were not given proper notice of the contents of the act as required in Amendment 397. Although there were differences between the act as advertised and the act as passed, we hold that the trial judge was authorized to find that none of the alleged variations between the notice and the act was material.
The appellants point out five variances which they deem are sufficient to invalidate the entire act:
A. The provisions of Section 46 (Code 1975, § 11-65-46) requiring a referendum of electors residing in the county, outside the corporate limits of Birmingham, in addition to the referendum of electors residing within the city of Birmingham.
B. The provisions of Section 4 (Code 1975, § 11-65-4) providing for the appointment by the lieutenant governor of Alabama of one member of the five-member commission created by the act, instead of by the mayor of the Class I municipality, as stated in the notice.
C. The provisions of Section 20 (Code 1975, § 11-65-20) establishing a "state wagering fee" of 1% of the amount wagered after the fifth year of horse track operations, a provision not specifically set out in the notice.
D. The provisions of Section 36 (Code 1975, § 11-65-36) which set forth a list of some 29 governmental and charitable not-for-profit organizations designated to receive stated percentages of "net proceeds" received by the commission after payment of expenses, which were referred to in the notice as disbursements for "various governmental and charitable purposes in the host county including disbursements to private, not-for-profit organizations," but not listed or specified by name.
E. The notice failed to specify the powers of the Racing Commission as set out in the act.
Amendment 397 does require, as appellants argue, that any general law applicable only to one municipality, as this one is, be advertised as provided in Section 106, and that prior to the introduction of such a bill notice must be published which states the substance of the proposed law. Of course, the purpose of the notice requirement is to prevent the deception of those most directly affected by the proposed law and to allow those opposed to the bill "to protest against and oppose its enactment." Wallace v. Board of Revenue of JeffersonCounty, 140 Ala. 491, 502, 37 So. 321, 323 (1904).
Because the public notice is intended to prevent deception of the public, the notice need not state all the details of the bill, only its substance. "Substance" has been defined as "the essential or material part, the essence, the meaning or abstract * * * and not [an act's] mere purpose or subject.Wallace, 140 Ala. at 502, 37 So. at 323. Out of the many decisions considering Section 106, four canons of construction have emerged: *Page 1119 
 "(1) The `substance' means an intelligible abstract or synopsis of [a bill's] material and substantial elements; (2) the substance may be sufficiently stated without stating the details subsidiary to the stated elements; (3) the legislature may shape the details of proposed local legislation by amending bills when presented for consideration and passage; and (4) the substance of the proposed act as advertised cannot be materially changed or contradicted."
Birmingham-Jefferson Civic Center Authority v. Hoadley,414 So.2d 895, 899 (Ala. 1982).
The public notice need not state all the details of the bill, and need not set forth the bill in its entirety. Gray v.Johnson, 235 Ala. 405, 407, 179 So. 221, 223 (1938); Opinion ofthe Justices, 433 So.2d 451, 452 (Ala. 1983); Opinion of theJustices, 435 So.2d 731, 733 (Ala. 1983). The notice need only state an intelligible abstract or synopsis of the bill's material and substantive elements, leaving the legislature free to shape and improve the details of the proposed bill during the legislative process. The rule is that the legislation, when finally enacted, must not be materially and substantially different. See, Adam v. Shelby County Comm'n, 415 So.2d 1066
(Ala. 1982). As this Court has stated:
 "The Constitution does not proceed upon the theory that all the details of every proposed law will be worked out in advance and without the aid of legislative wisdom. It requires only that the local public shall be advised of the substance of the proposed law, of its characteristic and essential provisions, of its most important features.
 "A narrow and literal construction would destroy all power of amendment in the legislative process, so that the legislature would be required to accept, if at all, every local bill in the exact terms of its proposal. Not being inclined to hamper legislation unnecessarily, this court has held that the Constitution was not intended to interfere with the right of the legislature to shape up and work out the details of local legislation."
McGehee v. State ex rel. Tate, 199 Ala. 287, 290, 74 So. 374,375-76 (1916) (citations omitted).
Bearing these principles in mind, we now address each alleged material variation individually.
 A The County-wide Referendum
The final version of the act required a county-widereferendum to approve horse racing in Birmingham. However, the published notice was addressed only to voters in Birmingham. The trial court found this to be a material variation, but ruled that this provision could be severed from the act without affecting the outcome of the referendum because voters in the county, as well as those in Birmingham, had already approved the act.
We hold that although the published notice was only addressed to the voters in the city of Birmingham, the legislative change to require the entire county to vote on the question was not so material as to invalidate the act; consequently, we do not agree with the learned trial judge that the variance was material, but his judgment on the effect of the variance is correct, nevertheless. As we have already pointed out, residents in the Birmingham metropolitan area will be affected and the population of adjoining areas is one of the reasons we have concluded that the legislature is authorized to make the classification it did.
The purpose of the act is to provide for horse racing in Class I municipalities. The provision for the county-wide referendum was added as a result of public comment and criticism during the amendment process because many citizens and legislators felt that all of the residents of the host county would be affected sufficiently by the conduct of horse racing and pari-mutuel wagering to warrant their participation in the referendum; however, only city residents are directly affected by the purpose of the act. *Page 1120 
This legislative scheme is shown by § 46 of the act. That section provides that horse racing would be authorized only if approved both by all voters casting votes and a majority of voters casting votes who lived in the municipality affected.
Thus, the outcome of the referendum was largely dependent upon the votes of city electors. If approved by a sufficient number of votes, the fact that voters in the county did not approve of the act would be of no effect; however, the opposite is not true. Even if a sufficient number of county voters together with city voters approved the act, if voters in the city did not vote in favor of the act, the referendum would fail to pass.
As we have already stated, we disagree with the trial judge's holding that the provision regarding the county-wide referendum is material, but the result he reached is consistent with our determination of this issue.
 B Method of Selection
The trial court also found that "the method of selection of persons serving on boards and commissions is a material part of the required notice." Nevertheless, the court held that changing the method of selecting only one member of the commission was not material. We agree.
The published notice provided that the members of the Birmingham Racing Commission were to be as follows: the mayor of the sponsoring city (Birmingham), the president of the host (Jefferson) county commission, one member appointed by state representatives from the host (Jefferson) county, one member appointed by state senators from the host (Jefferson) county, and one member to be appointed by the mayor of the sponsoring city (Birmingham). The act provided that the final member was to be appointed by the lieutenant governor of Alabama, rather than by the mayor of Birmingham, as provided for in the notice. We do not, under these facts, find this to be a material variance.
In Opinion of the Justices No. 97, 252 Ala. 361, 362,41 So.2d 266, 267 (1949), this Court faced a similar question and determined that the change was not a material alteration in thesubstance of the act in question. In the factual context considered in that opinion, the bill as advertised established a Board of Revenue of Colbert County and designated by name four of the five members of the board and provided that the fifth member would be appointed by the Governor. The law, as enacted, was changed to designate by name the fifth member ofthe board. The Court opined that the change in the method of selection of one member was not a material change in the substance of the bill.
Appellants cite Birmingham-Jefferson County Civic CenterAuthority v. Hoadley, 414 So.2d 895 (Ala. 1982), and Parrish v.Faulk, 293 Ala. 401, 304 So.2d 194 (1974), as support for the contention that the change in the method of selection is material. In both of these cases, the change from the published notice to the act was found to be material; however, the changes in those two cases were much more substantial than that made here.
In Hoadley, the published notice stated that nine members of the board of directors of the Jefferson County Civic Center Authority were to be appointed by state senators and representatives from Jefferson County voting jointly. The act provided that five members of the authority were to be appointed by the Senate delegation and four were to be appointed by the House delegation. This worked a complete change in the composition of the authority. As the Court stated: "[A] change in the very authority by whom those directorships are to be filled, and a change in the number which are to be filled by an altered selection authority, are not immaterial changes, for they go to the very essence of the selection process itself." Birmingham-Jefferson County CivicCenter Authority v. Hoadley, 414 So.2d at 899.[3] *Page 1121 
Similarly, in Parrish, this Court found material a change in the method of appointment of the license commissioner of Houston County. The published notice informed the public that the office would be filled by an appointing board composed of three designated officials. The act as passed provided that the office would be filled by qualified electors. This Court did there hold that this changed the method of selection and was substantial.
Here, four directors are selected in exactly the manner specified in the notice published with respect to the Act. Thus, the deviation relating to the selection of the fifth commission member is merely a change in detail and not a material alteration in the substance of the Act.
 C The State Tax
The published notice made no mention of the imposition of a state tax on pari-mutuel wagering. The Act provided that after the horse racing facility had operated for five years, holders of licenses issued by the racing commission would be subject to a tax. None of the revenue collected by the racing commission, however, is subject to a tax.
It seems reasonable to assume that, given the notice to the public that one feature of the act was to raise revenue, the public was adequately placed on notice that the state would have an interest in taxing pari-mutuel wagering on horse racing. We can assume that one of the major reasons for enacting legislation permitting horse racing in the state was the belief by the legislature that this would bring additional revenue into the state. "If the details are not published but only the general nature of its substantive features, the public is put upon inquiry as to such details, and bound by a failure to inform itself, continuing through such changes and amendments as may stay within such substantive features as published." State ex rel. Wilkinson v. Allen, 219 Ala. 590,593, 123 So. 36, 38 (1929). In any event, not informing the public of a tax to take place in the future, under these facts, does not change the substance of the act itself, and is not material. See, Opinion of the Justices No. 303, 435 So.2d 731
(Ala. 1983). The primary purpose of the act was to authorize horse racing and pari-mutuel wagering thereon. The addition of a tax does not substantially affect the purpose of the act.
 D Failure to List Recipients of Racing Commission Revenues
Similarly, the omission from the notice of a detailed listing of the recipients of the net revenues of the racing commission is not material. The notice states that such net revenues will be distributed to various governmental and private, not-for-profit entities. Thus, any interested citizen is put on inquiry concerning the details of this distribution. In any event, the act is intended to provide a means for permitting and regulating horse racing and pari-mutuel wagering in Class I municipalities and is not primarily intended to provide funds for the various governmental bodies and public or private institutions and organizations. Thus, the allocation of the net revenues of a commission does not constitute a material feature of the Act which would require the details thereof to be stated in the public notice.
 E Failure to Specify the Powers of the Racing Commission
Finally, appellant Phalen argues that material omissions arise from the failure of the notice to specify the powers of the commission and the conditions under which the commission can grant licenses. This is not a material omission, because the published notice summarized all of the important *Page 1122 
features of the powers of a racing commission created under the act with respect to the licensing, regulation, and supervision of horse racing and pari-mutuel wagering thereon. Moreover, the act does not itself comprehensively state the conditions under which horse racing and pari-mutuel wagering can be conducted, but the act specifically empowers a commission to determine such conditions in the exercise of its power to make rules and regulations. The notice stated that the proposed law would determine such conditions or give a commission the authority to determine them, and the act was consistent with this notice.
 III
Although the trial court held that the act as a whole does not violate the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, it found that Sections 37, 39, and 40 of the Act (Code 1975, §§11-65-37, -39, and -40) do violate the equal protection clause by defining certain crimes which are not applicable to the entire state.
The Birmingham Turf Club filed a cross-appeal in which it challenged the correctness of the trial court's decree in this respect. The crimes in question are not limited to the sponsoring municipality in which a racing facility may be located, but encompass many acts that may be performed anywhere in the state of Alabama. Section 37 of the act prohibits the holding of a horse race or the conducting of pari-mutuel wagering, except pursuant to a license as prescribed in the act. Section 39 of the act prohibits the fixing of horse races and tampering with, or administering drugs to, horses participating in a licensed horse race. Neither Section 39 nor 40 is limited by its terms to acts committed within the corporate limits of the sponsoring municipality, but those sections prohibit such acts everywhere within the state of Alabama. Section 40 of the act regulates the transmission of information concerning horse races and prohibits the use of information acquired at a licensed racetrack in furtherance of illegal gambling purposes. Although the transmission of prohibited information requires physical proximity to a licensed horse racing facility, the receipt and use of such information does not. Thus, the act prohibits such illegal use of information anywhere within the state of Alabama. Equal protection considerations do not apply to Sections 37, 39, and 40 of the act, because these sections apply throughout the state of Alabama.
Prior to the establishment of population classes in §11-40-12, general acts of local application related to dog racing contained similar criminal provisions. For example, Section 14 of the Mobile dog racing act (Act No. 2431, Ala.Acts 1971) made violations of pari-mutuel betting restrictions a misdemeanor with a fine of up to $500 and imprisonment for up to six months. Section 20 made the holding of unlicensed races a misdemeanor with a fine of $100 to $1,000 and/or imprisonment from 15 days to 6 months. Predetermining the results of a race (Section 22, Act No. 2431) and illegally transmitting racing information (Section 23 of Act No. 2431) were made felonies carrying a sentence of 1 to 10 years and/or a fine of $1,000 to $5,000.
Violations of the act providing for private game preserves in counties having populations of 300,000 to 500,000 was made a misdemeanor by Act No. 525, Ala. Acts 1967, p. 1256.
Many other examples abound in the general statutes of local application passed by the Alabama legislature prior to the adoption of Amendments 375 and 397. It is inconceivable that Amendment 397 was intended to prevent the population-class legislation authorized there as general laws "for any purpose" from containing appropriate criminal provisions which in practice had been included for many years in properly written general laws of local application.
Finally, because the act does not violate the equal protection clause by permitting horse racing and pari-mutuel wagering only in Class I municipalities, it does not violate the equal protection clause by defining *Page 1123 
crimes uniquely applicable to such a horse racing facility.
Logically, some regulation of the facility is necessary to insure that the races are honestly run, and to insure that the racing commission's licensing powers are not usurped. These criminal provisions provide this protection for the public. Consequently, that portion of the trial court's judgment which severed these provisions from the act is due to be reversed.
AFFIRMED, IN PART; REVERSED, IN PART.
TORBERT, C.J., and FAULKNER, JONES, ALMON, SHORES, BEATTY, ADAMS* and HOUSTON, JJ., concur.
[1] While Belcher concerned an act applicable to counties, the same rationale has been applied to acts which covered cities as well. See, City of Birmingham v. Samford, 274 Ala. 367,149 So.2d 271 (1963).
[2] Peddycoart expressly held that if an act applies to only one subdivision when enacted, it is local. All parties in this case, except the Cope Appellants, agree that this is the holding of Peddycoart. Had Peddycoart stated what the Cope
appellants contend, there would have been no need for the legislature to amend Section 110.
[3] For a discussion of the difference between a "detail" and "substance," see the dissenting opinion of Maddox, J., inBirmingham-Jefferson County Civic Center Authority v. Hoadley, 414 So.2d at 900.
* Although Justice Adams did not sit at oral argument, he has listened to the tapes and has studied the briefs.